**UNITED STATES of America**

v.

**David Warren SCHRUM.**

**Crim. No. 25–72–NN.**

United States District Court,
E. D. Virginia,
Newport News Division.

Sept. 8, 1972.

Roger T. Williams, Asst. U. S. Atty., Norfolk, Va., for plaintiff.

C. Vernon Spratley, Jr., Newport News, Va., for defendant.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

The defendant is charged in a six-count indictment with violations of the National Firearms Act, 26 U.S.C. § 5801 et seq., stemming from the manufacture and transfer of two silencers. Counts one and four charge him with making a firearm without paying the tax as required by 26 U.S.C. §§ 5821, 5861(f). Counts two and five charge him with possessing a firearm not properly registered on the National Firearms Registration and Transfer Record, § 5861(d). Counts three and six charge the defendant with transferring a firearm in violation of the Act, § 5861(e).

The case came before the court for trial without a jury. The facts are not in dispute. On July 20, 1971, a special investigator for the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service, working in an undercover capacity, contacted the defendant and told him that he needed a silencer for a .38 caliber revolver. The defendant replied that he had made such silencers before and would do so again for $50.00. The defendant worked in a machine shop in Hampton, Virginia, and had access to the necessary tools to perform the work. That night, between the hours of 1:00 a. m. and 6:00 a. m., the defendant worked on the silencer. When the silencer was tested, the de-

fendant would turn on a generator or similar equipment to hide the noise of the shot. After the silencer was finished, it was given to the agent and he was instructed to pack it with steel wool in order to make it more effective. The agent again contacted the defendant on August 4, 1971, and represented that he needed another silencer for a 9 m.m. automatic pistol. The defendant told him to come to the shop the next night at 1:30 a. m. when nobody else was around. The next evening the agent showed up and approximately the same events transpired. The defendant was subsequently arrested.

The National Firearms Act is a strict and all-encompassing regulatory measure intended to control the availability of "gangster type weapons" which serve no useful purpose to the general public. Every manufacturer, importer and dealer in "firearms" must register annually (§ 5802) and pay a special occupational tax (§ 5801). Before any "firearm" may be made (§ 5822) or transferred (§ 5812), a person must apply for and receive the prior approval of the Secretary of the Treasury. A tax of $200.00 is imposed on each firearm made (§ 5821) and upon each subsequent transfer (§ 5811), unless the manufacturer or dealer has paid the special occupational tax (§ 5852). Each manufacturer is required to register every firearm he makes, and each subsequent transfer must be registered to the transferee by the transferor on the National Registration and Transfer Record in Washington, D. C. (§ 5841). Every person making, importing, possessing or transferring a firearm must see to it that the firearm is properly identified by serial number (§ 5842). An intent to violate the act is not required. United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971).

The issue here is whether the devices made by the defendant were silencers within the meaning of the National Firearms Act. Section 5845(a)(7) includes within the definition of a firearm, "a muffler or a silencer for any firearm whether or not such firearm is included within this definition." The term silencer or muffler is not further defined in the Act or its legislative history. The defendant contends that to be a silencer any device must *substantially* diminish the noise of a firearm. The two silencers involved in this case certainly appeared to be silencers as this term is used by the general public. They are cylindrical devices which attached to the ends of guns. The "silencer" for the .38 caliber revolver was removable from the pistol, whereas the one for the 9 m.m. automatic was permanently affixed. Both devices were designed and did function under the gas absorption principle. Upon the firing of the pistols the silencer acts to cool the escaping gases and thereby reduces the sound made when they reach the end of the barrel. Although the two silencers in question functioned, they were not particularly effective. The silencer for the .38 caliber revolver reduced the decibel level of the sound from 132 decibels to 122 decibels, or roughly 7 to 8%. The second silencer reduced the sound level from 131 decibels to 125 decibels, or approximately 4 to 5%. At trial, a demonstration was performed using pistols with and without the silencers attached. A slight reduction in the sound level could readily be detected in both cases. However, to the human ear, the sound level was not "substantially" diminished.

The National Firearms Act was originally enacted in 1934 (48 Stat. 1236). At that time the weapons which were included within the definition of a firearm were listed but undefined. The Act has been amended and codified into the Internal Revenue Code several times since 1934. At present almost every term included within the definition of a firearm has been explicitly defined except a muffler or silencer. As administrative action and court litigation have arisen under the Act, Congress has amended the statute to clear up ambiguities and to alter the construction of the Act given to it by the courts. It would appear, how-

ever, that no such problems have arisen under the definition of a silencer because no court cases have raised the issue. Therefore, it is not surprising that the legislative history fails to assist us in this case. The legislative history of the Act dealing with other definitions can be read both ways to infer Congress intended that the definition of a silencer be given both a broad and a narrow construction. Congress has recently amended the statute to explicitly include, within the definition of a firearm, those guns which are temporarily inoperable (§ 5845), and even unserviceable firearms are covered by the Act, except for a special tax exemption (§ 5852). United States v. Whalen, 337 F.Supp. 1012 (S.D.N.Y.1972). It can be argued that since Congress has provided for sweeping coverage of these ganster-type weapons, i. e., even unserviceable firearms, it has intended to cover ineffective silencers. However, the definition of an unserviceable firearm (§ 5845(h)) clearly does not include a silencer or muffler because it is limited to those "firearms" which expel a shot. Taking this into consideration, it can be argued that Congress, in explicitly covering unserviceable arms, meant to exclude unserviceable silencers. However, a fair reading of the Act's legislative history shows that Congress has been acting in a practical fashion, attacking particular problems as they arise. We cannot read the legislative history of the Act as implying either a limited or broad construction to the term silencer. The legislative history is neutral.

■ In the absence of express definition by Congress, words in a statute are to be given their commonly accepted meaning. Webster's Third New International Dictionary, 1966, defines a silencer as:

"c: a silencing device for small arms that permits the exit of the projectile but *reduces* the noise without materially impeding the escape of the ex-

ploding gases d: a device *for* silencing or *reducing* noise." (emphasis added).

The regulations issued by the Secretary of the Treasury under the National Firearms Act defines a muffler or silencer in 26 C.F.R. § 179.11. They provide:

"*Muffler or silencer.* Any device *for* silencing or *diminishing* the report of any portable weapon, such as a rifle, carbine, pistol, revolver, machine gun, submachine gun, shotgun, fowling piece, or other device from which a shot, bullet, or projectile may be discharged by an explosive, and is not limited to mufflers or silencers for 'firearms' as defined." (emphasis added).

■ This regulation has existed since it was originally issued to implement the National Firearms Act. Since we find that the two definitions of a silencer are basically the same, we need not reach the issue of whether the regulations have the force of law. Both definitions speak in terms of reducing or diminishing the noise of a weapon, rather than substantially reducing the noise. We believe that this is all the statute requires. The National Firearms Act regulates "gangster-type" weapons and destructive devices, i. e., explosives. Congress has found that these "firearms" have no legitimate purpose, save and except in the hands of government authorities and a few others. The fact that the device is designed to silence the report of a gun and does so, even though not to a substantial degree, is the type of "firearm" covered by the Act. Congress wanted to control and stop the trafficking of these silencers. The purpose of the statute would be frustrated if a device, clearly designed, made and sold as a silencer, was not prohibited. The danger of limiting a silencer to one which substantially diminishes noise is shown by this case. The defendant himself told the undercover agent to pack the silencer with steel wool to further

reduce the .38 revolver's discharge. Congress prohibited the manufacture, possession or transfer of silencers without qualifying that term. It did not say that a person could lawfully practice making these devices until a level of proficiency was achieved where they substantially reduced the noise of a weapon. Therefore, we define a silencer as a device which is designed to reduce the noise of a weapon. This is a practical standard and would not require looking into the subjective intent of the person charged. It would be an objective inquiry into the mechanical functioning of the device. Before any device could be termed a silencer, one of its primary purposes or functions must be to reduce noise levels.

Defendant cites United States v. Thompson, 202 F.Supp. 503 (N.D.Cal. 1962), for the proposition that a "silencer," which does not silence, cannot be a "silencer." The court in *Thompson* held that a sawed-off shotgun without a firing pin was not a firearm within the meaning of the National Firearms Act. This case must be considered weak precedent [1] even before the Gun Control Act of 1968 which overruled the holding by statutory amendment. However, even if *Thompson* is regarded as precedent, it can be distinguished from the case of a silencer. The court in *Thompson* said, "It is important to note that a determination of what is and what is not a 'firearm' depends in great part upon whether the particular object in question will or will not propel a shot through explosive energy." In other words, the inquiry is whether the shotgun functioned and not how well it functioned.

Counsel for defendant also contends that the term silencer is so vague as to contravene the due process clause of the Fourth Amendment. He argues that unless the definition is limited to one which *substantially* reduces the noise, then any legitimate device attached to a firearm and reduces the noise could be called a silencer. An example would be a barrel extension or a device to reduce the kick of a weapon which incidentally reduces the noise level. We feel these legitimate attachments would not be covered by the definition of a silencer, in and of themselves, because they do have as one of their primary functions the silencing or reducing of noise. Any such reduction is merely incidental to a legitimate purpose and unavoidable. As we have defined the term silencer it comports with commonly accepted meaning of the term. "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Harriss, 347 U.S. 612, 74 S. Ct. 808, 93 L.Ed. 989 (1953). "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." Sproles v. Binford, 286 U.S. 374, 393, 52 S.Ct. 581, 587, 76 L.Ed. 1167 (1932). Every word is subject to various meanings. The courts cannot expect Congress to express itself with mathematical certainty. The statute covers silencers within their generally understood meaning; of this we have no doubt. "If the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts may arise." United States v. Harriss, *supra*.

For the foregoing reasons we find the defendant guilty on all counts of the indictment as charged.

---

1. See United States v. Cosey, 244 F.Supp. 100 (E.D.La.1965).